948 So.2d 609 (2006)
John Ruthell HENRY, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-153.
Supreme Court of Florida.
October 12, 2006.
As Revised on Denial of Rehearing January 25, 2007.
*611 Baya Harrison, III, Monticello, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Candance M. Sabella, *612 Assistant Attorney General, Chief of Capital Appeals, Tampa, FL, for Appellee.
PER CURIAM.
John Ruthell Henry, a prisoner under sentence of death for the murder of his five-year-old stepson, Eugene Christian ("Eugene"), appeals the denial of his motion for postconviction relief filed pursuant to Florida Rules of Criminal Procedure 3.850 and 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Applying the two-prong test from Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we determine that Henry has failed to establish either that his counsel's performance was deficient or that the deficient performance prejudiced the defense. In doing so, we recognize that defense counsel's strategy entailed significant risk to the defendant and should be employed with caution and only after careful analysis. Nevertheless, we cannot find that this strategy fell below the "wide range of professionally competent assistance" when evaluated from counsel's perspective at the time defense counsel suggested and Henry agreed to this strategy. See id. at 689-90, 104 S.Ct. 2052. Furthermore, Henry has not shown that "there is a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052; see also Hodges v. State, 885 So.2d 338, 345-46 (Fla.2004).

Statement of the Facts and the Case
Eugene's death originated from a dispute that occurred on December 22, 1985, in Pasco County, between John Ruthhell Henry ("Henry") and his estranged wife, Suzanne Henry ("Suzanne"). It ended when Henry, by his own admission, "freaked out," stabbed Suzanne thirteen times in the neck, and covered her body with a rug. According to Henry, he then picked up her son, Eugene, who was watching television in another room, and drove the child to Plant City in Hillsborough County. The two stopped a number of times to purchase beer and cocaine for Henry and a snack for the child. Henry smoked some of the cocaine as he drove. On the way back to Pasco County, Henry thought he saw flashing lights in the background. He pulled over into an isolated area where the car got stuck in the mud. Henry and Eugene walked a short distance. Henry stopped to smoke more cocaine, took Eugene on his knee, and stabbed the boy to death.
Two days later, Henry led the police to Eugene's body. The police had arrested Henry in connection with Suzanne's murder. After reading Henry his Miranda[1] rights, Detective Fay Wilber questioned Henry about Eugene's whereabouts. At one point in the interview, Detective Wilber stood up and said that he was going to leave and find the boy without Henry's help. After this, Henry confessed. He told Detective Wilber that Eugene was in Plant City, that the boy was not alive, and that he would lead the police to the crime scene. At the crime scene, the police discovered the five-year-old's body with five stab wounds in the neck. Henry recounted the details of what happened on December 22 to the police and confessed to murdering both Suzanne and Eugene.[2]
*613 On November 15, 1987, Henry was sentenced to death in Hillsborough County for killing Eugene,[3] but this Court reversed the conviction on direct appeal and required that Henry be given a new trial. Henry v. State, 574 So.2d 66, 71-73 (Fla. 1991).[4] In August 1992, he received this new trial and was again convicted.[5] The jury recommended death by a vote of eleven to one. The trial judge agreed that death was the appropriate penalty. Finding that the two aggravating factors outweighed the two statutory and six nonstatutory mitigating factors, the court sentenced Henry to death.[6] This Court affirmed the judgment and sentence on direct appeal. Henry v. State, 649 So.2d 1361 (Fla.1994).[7]
*614 On September 12, 2002, Henry filed a "Complete Post Conviction Motion to Vacate Judgment and Death Sentence" pursuant to Florida Rule of Criminal Procedure 3.850. Following a Huff[8] hearing, the trial court ordered an evidentiary hearing on three of Henry's ineffective assistance of counsel claims. The evidentiary hearing occurred on October 17, 2003, and on December 17, 2003, the trial court entered an order denying relief. The trial court found that Henry failed to meet either prong of the Strickland test.
The first claim asserted that defense counsel failed to adequately investigate the defense of insanity. Henry voluntarily waived this defense at the evidentiary hearing.
The second claim was that defense counsel failed to adequately investigate the defense of voluntary intoxication. The trial court recognized that Henry's counsel presented three experts and two lay witnesses at trial who testified that Henry lacked the specific intent to commit this crime. Moreover, at the evidentiary hearing, Henry provided no other witnesses that could have testified. As determined by the trial court, "just because Dr. Mosman [i.e., the expert whom Henry's appellate counsel asked to testify at the evidentiary hearing] or any other individual, with the benefit of hindsight would have proceeded with the experts differently, does not entitle Defendant to post conviction relief." Henry did not contest the trial court's finding in his appeal to this Court.
Henry's third claim was that his counsel was ineffective for leading him to testify that he (1) had earlier been convicted of stabbing Patricia Roddy; (2) had served only half his sentence for this crime; and (3) had been given the death penalty for Suzanne's murder. In denying this claim, the trial court found that defense counsel "made a tactical, strategic decision, with the joint consent of both co-counsel, Mr. Wells, and the Defendant to disclose the Roddy murder to the jury during the guilt phase." It also found that the decision to disclose Henry's sentence for the Roddy murder and his death sentence for Suzanne's murder were "tactical, strategic decisions." Moreover, it recognized that the decisions were made by the lead defense *615 counsel, who had significant trial court experience.[9]
At the evidentiary hearing, Henry's lead defense counsel, William Fuente, testified to the dire situation facing defense counsel as they approached Henry's second trial for Eugene's murder and the fourth trial for the events surrounding Eugene's death:
[F]rom our perspective it was a very difficult case. First of all, [Henry] had been convicted once before. Secondly . . . the underlying facts were that he had confessed to the authorities to the offense, that so that was difficult. . . . And beyond that . . . there was a lot of other evidence beyond this confession that implicated him in the offense.
Defense counsel also testified that its trial strategy was to disclose everything:
Well, the decision to proceed the way we did, and this is let Mr. Henry testify and acknowledging everything, was arrived at . . . within a couple of months of the trial commencing. And my recollection of this we had awe had a meeting, Mr. Henry, Mr. Wells [defense co-counsel] and myself . . . just throwing the idea around. At the time, the thinking was that [Henry] had already been convicted once of his offense . . . and then again in [Pasco] County of a homicide that occurred previously, and based upon our assessment of the evidence the state had against him, it was highly unlikely we were going to achieve an acquittal. So our best hopeour thought was our best hope was to try to achieve, number 1, a conviction on a lesser on some defense where we could get into thehis mental history, and the only way that could happen was we would agree with an insanity or a voluntary intoxication defense, and we chose the latter. We excluded considering the insanity defense because of the, really the flip-flopping of one or two of the doctors.
. . . .
And the other concern was that after discussing with Mr. Henry my having been in this situation before and Mr. Wells having been in this situation whereby if we approached this case on a pure not guilty, then denying the offense, if you will, it would have likely culminated in a situation where that jury would not have known, likely would not have known about . . . the Pasco County murder, which happened very shortly before and the Roddy murder which happened some ten years before. So we would have been faced with a client whose jury just found him guilty and then at penalty phase for the first time that jury would have known about two other homicides. We were almost certain that would result in a recommendation of death. So our strategy, if you will, was to lay it all out on the table so that the jury would not be surprised, they would know everything there was to know and again, that was a calculated decision on all our parts.

*616 (Emphasis added.) Moreover, defense counsel testified that this decision was specifically discussed with Henry in advance and that Henry consented to it:
I [Henry's trial counsel] have a photographic recall of one brief part of that interview and I remember myself saying . . . to the other two, Mr. Henry and Mr. Wells, what do you folks think about us letting everything hang out . . . and I recall we had further discussions and we certainly contemplated pros and cons . . . and I remember reaching that consensus.

Analysis
The issue on appeal is whether Henry's counsel was ineffective for leading Henry to testify on direct examination during the guilt phase that (1) in 1976, he had pled no contest to second-degree murder in the death of his first wife, Patricia Roddy, and had served seven and a half years of his fifteen-year sentence for that murder; (2) Patricia Roddy, like Eugene, was stabbed to death; and (3) Henry had received the death sentence for Suzanne's murder.
To prevail on his claim of ineffective assistance of counsel, Henry must show both deficient performance and prejudice arising from this deficiency. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. We apply a mixed standard of review, deferring to the trial court for findings of fact and reviewing the trial court's legal conclusions de novo. Cave v. State, 899 So.2d 1042, 1052 (Fla.2005). We find that Henry has failed to establish either prong. Defense counsel's decision to elicit the details of Henry's prior conviction and death sentence during the guilt phase certainly entailed significant risk for the defendant. However, in the final analysis, we cannot find that this decision was "outside the wide range of professionally competent assistance" given the totality of the circumstances facing defense counsel as they prepared for this case. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Furthermore, Henry has not established that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." Id. at 694, 104 S.Ct. 2052. We explain this conclusion by elaborating first upon the standard for ineffective assistance of counsel in Strickland and then applying this standard to the particular facts of this case.
Under the Strickland test for ineffective assistance of counsel, a defendant must first establish that defense counsel's performance was deficient, or that defense counsel's performance fell beyond an "objective standard of reasonableness," such that counsel could not be said to be functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88, 104 S.Ct. 2052. This showing requires the defendant to overcome a strong presumption that the counsel's action was not deficient. Mansfield v. State, 911 So.2d 1160, 1171 (Fla.2005) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). As the United States Supreme Court instructed in Strickland:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's *617 perspective at the time. Because of the difficulties inherent in making evaluations, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, supra, 350 U.S. at 101, 76 S.Ct. 158.
466 U.S. at 689, 104 S.Ct. 2052.
In light of this measured deference, evidence that counsel's conduct was part of a deliberate, tactical strategy that the defendant understood and approved almost always precludes the establishment of this prong. Downs v. State, 453 So.2d 1102, 1108 (Fla.1984) (characterizing defense counsel's strategic or tactical decision as "virtually unchallengeable" in a claim of ineffective assistance of counsel). This is especially true if the defense counsel considered and rejected alternative courses of action. Lawrence v. State, 831 So.2d 121, 129 (Fla.2002) ("This Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected."); see also Patton v. State, 878 So.2d 368, 373 (Fla.2004) (rejecting ineffective assistance of counsel claim raised in 3.850 motion, in part because trial counsel "thoroughly considered her options [and] weighed the pros and cons [of the action]").
If a defendant establishes that his counsel's performance was deficient, he must establish the second prong as well, which requires him to show that defense counsel's actions prejudiced him. The defendant must establish that defense counsel's deficient performance was so serious that the defendant was deprived of a fair trial. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To establish deprivation of a fair trial, the defendant must show that there is a reasonable probability that, "absent the errors, the factfinder would have a reasonable doubt respecting guilt." Robinson v. State, 770 So.2d 1167, 1172 (Fla. 2000) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. It does not require the defendant to show that "counsel's deficient conduct more likely than not altered the outcome," but it does require the defendant to show that in light of all the evidence surrounding his conviction, defense counsel's conduct renders the results of the proceeding unreliable. Gaskin v. State, 822 So.2d 1243, 1247 n. 3 (Fla.2002) (quoting Strickland, 466 U.S. at 693, 104 S.Ct. 2052); see also Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

I. Deficient Performance
Applying this two-prong test from Strickland, we find that Henry has failed to establish that his counsel's performance was deficient in making the decisionwell before trial and with Henry's informed consentto question Henry about Patricia Roddy's murder, the sentence he served for this crime, and the death sentence he received for Suzanne's murder. While this testimony would not otherwise have been admissible if it had not been raised by the defendant on direct examination,[10] we recognize that the facts of this case would lead reasonably prudent defense counsel to believe there was a strong likelihood Henry would be convicted in the guilt phase and, therefore, that counsel would need to *618 consider the impact of the guilt phase on the penalty phase. See Florida v. Nixon, 543 U.S. 175, 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (recognizing that the gravity of the potential sentence in a death penalty trial and the two-tier proceeding "vitally affects counsel's strategic calculus" when approaching a death penalty case). Henry had confessed to brutally stabbing to death his five-year-old stepson hours after he killed the child's mother in a similar manner. Three prior juries had recommended Henry be sentenced to death for these crimes. Confronted with this reality, defense counsel was obligated to prepare a strategy that considered not only the guilt phase, but also the penalty phase. Given these circumstances, we do not find the decision to question Henry about his past criminal record to be outside the wide range of professionally competent assistance. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (defining "deficient performance" as "outside the wide range of professional competence").
The decision to question Henry about these otherwise inadmissible facts was jointly reached. It was part of a deliberate strategy to avoid a death sentence, suggested by highly experienced criminal defense attorneys and agreed to by Henry. Fuente testified that "a couple months before trial," he, Henry, and co-counsel Wells met to discuss possible trial strategies. The decision to reveal Henry's past criminal history began as an idea that they were "just throwing . . . around." However, after "further discussions" and "contemplat[ing] the pros and cons," they mutually decided it was the best available option.
Fuente's testimony portrays the extremely difficult situation defense counsel faced in preparing for Henry's second trial for Eugene's murder. Not only had Henry been convicted of first-degree murder in each prior trial involving the deaths of Eugene and Suzanne, a jury had recommended the death sentence in each of these trials. This recommendation was unanimous in both trials for Suzanne's murder, and affirmed by a strong vote of ten to two in the prior trial for Eugene's murder. Moreover, counsel recognized that underlying each of these recommendations was a very strong case for the State in the guilt phase. As Fuente testified, "the facts as I remember them, the underlying facts were that [Henry] had confessed to the authorities. . . . And beyond that . . . there was a lot of other evidence . . . that implicated [Henry] in the offense." In light of this, Fuente expressed a fear that withholding information regarding Henry's prior background
would have likely culminated into a situation where the jury would not have known, likely would not have known about the . . . [Pasco] County murder, which happened very shortly before and the Roddy murder which happened some ten years before. So we would have been faced with a client whose jury just found him guilty and then at penalty phase for the first time that jury would have known about the two other homicides. We were almost certain that would result in a recommendation of death.

(Emphasis added.) Therefore, the defense strategy was "to lay it all out on the table so that the jury would not be surprised." In Fuente's words,
The potential benefit [of telling the jury about the Roddy homicide in the guilt phase], as [defense counsel] perceived it, was simply to let the jury know everything there was to know upfront, be completely candid, and if they returned a verdict of first degree murder, there would be no surprise, nothing more for *619 them to consider, nothing more aggravating if you will [in the penalty phase].
In reaching this strategic decision, defense counsel and Henry considered other alternatives. Fuente testified that both Henry and co-counsel Wells agreed to this unusual strategy after several meetings in which they considered its pros and cons. In doing so, they considered the available defenses, including insanity. An insanity defense was abandoned because the experts "flip-flopp[ed]" on whether the defendant was insane, making it unlikely the jury would render a verdict of not guilty based on insanity. Defense counsel believed Henry's "best hope" was to present a voluntary intoxication defense and argue for a lesser included offense; but, given the strong evidence against Henry and that the prior jury had rejected the evidence in support of this defense, counsel had to anticipate and be prepared for a penalty phase.
We have repeatedly rejected claims of ineffective assistance of counsel when the allegedly improper conduct was the result of a deliberate trial strategy. See Lawrence, 831 So.2d at 129 (citing Shere v. State, 742 So.2d 215, 220 (Fla.1999), for the proposition that "[t]his Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected"); see also Patton, 878 So.2d at 373 (citing Shere for the same proposition). Indeed, the facts of this case closely parallel Shere.
In Shere, this Court rejected an ineffectiveness claim based on defense counsel's strategic decision to offer evidence of a codefendant's admission during the guilt phase. 742 So.2d at 219-20. The Court found that "[a]t the conclusion of the State's case, the defendant was in a desperate situation," because "[t]he State's case-in-chief did not leave any doubt that the defendant played a major role in the murder." Id. (quoting trial court's order). This Court also relied on the fact that "defendant was represented by a highly competent and ethical trial attorney" who had made a "tactical decision after considering all of the evidence against his client and after considering all other alternatives." Id. (quoting trial court's order).
The same is true in Henry's case. Fuente had more than fifteen years of experience litigating criminal cases before he represented Henry. He had tried numerous capital murder cases, five of which involved the death penalty. Cf. Atwater v. State, 788 So.2d 223, 230 (Fla.2001) (relying, in part, on defense counsel's seventeen years of experience in criminal litigation and the fact that counsel had handled five or six capital cases to find that a preplanned strategy to concede defendant's guilt to a lesser crime was not "reviewable under Strickland"). When it became time to present Henry's defense, Fuente knew he would be facing a situation at least as desperate as the defendant's in Shere. At the time he rose to present Henry's case, the State would have just presented overwhelming evidence that Henry had brutally murdered his five-year-old stepson hours after he had brutally murdered the boy's mother. This evidence would have included the details of Suzanne's murder, as this Court had previously determined that the facts were "inextricably intertwined with [Eugene's] murder" and, therefore, admissible. Henry v. State, 649 So.2d at 1364-65. The State's case would also have included Henry's detailed confession to the police and the fact that Henry had led the police to the boy's body. As noted earlier, a prior jury had convicted Henry of first-degree murder based on these facts and recommended a sentence of death by a vote of ten to two. It is not unreasonable for defense counsel, when *620 faced with these circumstances, to believe that extreme measures might be necessary in order to maintain credibility with the jury throughout both phases of the trial.
Both this Court and the United States Supreme Court have recognized the appropriateness of the end Fuente sought to achieve. In Atwater, this Court recognized the importance of establishing credibility with the jury. 788 So.2d at 229-30. The Court found that defense counsel was not deficient for conceding defendant's guilt of second-degree murder in its closing argument and supporting this concession by showing photographs of the crime scene to the jury. Id. "In light of the evidence against Atwater, defense counsel properly attempted to maintain credibility with the jury by being candid as to the weight of the evidence." Id. at 231.
Similarly, as previously mentioned, the United States Supreme Court has recently recognized the importance of preparing for the penalty phase in death penalty cases. "[T]he gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus" in regard to deciding whether to concede guilt in the guilt phase. Florida v. Nixon, 543 U.S. 175, 190-91, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). In cases like Henry's, where "the evidence is overwhelming and the crime heinous," id. at 191, 125 S.Ct. 551, "avoiding execution [may be] the best and only realistic result possible." Id. at 190, 125 S.Ct. 551 (alteration in original) (emphasis added) (quoting Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, § 10.9.1 cmt. (rev. ed.2003)). Therefore, "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." Id. at 192, 125 S.Ct. 551 (emphasis added).
We recognize that these cases are distinguishable from Henry's in that Henry's counsel did not merely concede guilt to a lesser offense but led his client to testify to highly incriminating evidence that would otherwise have been inadmissible in the guilt phase. This distinction, however, does not justify a finding that counsel's performance was deficient. When determining ineffective assistance claims, our duty is "not to grade counsel's performance," Strickland, 466 U.S. at 697, 104 S.Ct. 2052, or to use the Sixth Amendment to "improve the quality of legal representation." Id. at 689, 104 S.Ct. 2052. In hindsight, we might seriously question counsel's decision to introduce this evidence during the guilt phase. But such a hindsight evaluation does not answer the question of whether counsel was deficient. When determining whether counsel's performance is deficient, our duty is to make every effort "to eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time [counsel prepared for trial]." Id. at 689, 104 S.Ct. 2052. Viewed from this perspective, we find counsel's performance was not deficient. Henry's highly experienced trial counsel reasonably believed Henry almost certainly faced a penalty phase proceeding and that the only chance of avoiding execution was complete candor with the jury. They believed the only way to achieve this candor was to lead Henry to testify to these otherwise inadmissible facts during the guilt phase. Henry agreed to this strategy. Given the unique circumstances of this case, we find Henry has failed to overcome the strong presumption that counsel's performance was not deficient. See Strickland, 466 U.S. at 688-90, 104 S.Ct. 2052 (recognizing that defendants bringing an ineffectiveness claim must overcome a strong presumption and that courts must consider counsel's action in light of all the evidence in the *621 case because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the . . . range of legitimate decisions regarding how best to represent a criminal defendant").

II. Prejudice
In most cases, our determination that Henry has failed to meet the first prong of the Strickland test would end any further analysis. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052 (authorizing courts to dispose of ineffectiveness claims after addressing only one prong of the analysis). Nonetheless, given the uniqueness of this case, we will address the second prong as well.
Even if we agreed with Henry that defense counsel's line of questioning constituted deficient performance, this deficiency would not warrant reversal because Henry has not established that counsel's actions prejudiced him. To reiterate, Strickland requires defendants to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. Such a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Id. This second prong does not require proof that "counsel's deficient conduct more likely than not altered the outcome of the case." Gaskin v. State, 822 So.2d 1243, 1247 n. 3 (Fla.2002) (quoting Strickland, 466 U.S. at 693, 104 S.Ct. 2052). Instead, it requires a showing that, in light of all the evidence surrounding his conviction, the conduct renders the results of the proceeding unreliable. Id. at 1247; see also Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Viewing this case in its entirety, we find that Henry has not satisfied this burden. As explained above, defense counsel were confronted with an extremely strong case against their client. They had to calculate the impact of the guilt phase testimony upon a likely penalty phase. While Henry asserts that his defense of voluntary intoxication would have resulted in a conviction of a lesser included offense, thereby avoiding a penalty phase, he has failed to establish this claim. He has not established a reasonable probability that the result of the guilt phase would have been different. In other words, he has not proven this claim with a probability sufficient to undermine confidence in the outcome. First, voluntary intoxication is not a particularly strong defense to such crimes, and the evidence in support of this defense was weak. The only direct evidence establishing that Henry was intoxicated at the time he killed Eugene was Henry's own testimony. The two other lay witnesses presented at trial could only testify that Henry was intoxicated hours earliereven before he killed Suzanne. And for the murder of Suzanne, Henry again had received a death sentence in the second trial for her murder, an act "inextricably intertwined" with the case at hand. Second, the trial court found that defense counsel adequately presented this defense through the testimony of two expert witnesses and three lay witnesses, including Henry himself. Yet, the jury still rejected this defense. In summary, Henry has still failed to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Conclusion
We hold that Henry has failed to establish a claim for ineffective assistance of counsel. We affirm the trial court's denial of Henry's motion to vacate judgment and death sentence.
It is so ordered.
*622 WELLS, CANTERO, and BELL, JJ., concur.
WELLS, J., specially concurs with an opinion, in which CANTERO and BELL, JJ., concur.
PARIENTE, J., concurs in result only with an opinion.
LEWIS, C.J., concurs in result only.
ANSTEAD, J., dissents with an opinion.
QUINCE, J., recused.
WELLS, J., concurring specially.
I write only to respond to the dissenting opinion.
I find unsupported in the trial court's order the statement in the dissent that the trial court characterized defense counsel's conduct as "bad judgment" in several places in its order. What the trial judge actually said was: "The court further finds that even if this Court finds that Judge Fuente's tactical decision exhibited bad judgment, Defendant is not entitled to post conviction relief." State v. Henry, No. 85-14273-D (Fla. 13th Cir. order filed Dec. 23, 2003), order at 8.
I cannot locate and the dissent has not pointed to any finding by the trial judge that trial counsel exercised "bad judgment." Rather, what the record clearly shows and the trial judge's order does repeatedly state, as the majority opinion sets forth, is that a very experienced trial counsel made a studied tactical decision.
Though the dissent states in footnote 21 that Justice Anstead "has no qualms in conceding that it may sometimes be in a defendant's best interest to admit shortcomings or even concede guilt in order to focus on the penalty phase of a capital trial" and cites to Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), it appears to me that the dissent is written from the same perspective which led to this Court's error in Nixon v. State, 857 So.2d 172 (Fla.2003); see id. at 179-83, 183-89 (Lewis, J., concurring in result only; Wells, J., dissenting and joined by Shaw, Senior Justice), and to the Supreme Court's writing: "As Florida Supreme Court Justice Lewis observed, that court's majority misunderstood Cronic[[11]] and failed to attend to the realities of defending against a capital charge. Nixon [v. State], 857 So.2d [172,] at 180-183 (opinion concurring in result)." Florida v. Nixon, 543 U.S. at 189-90, 125 S.Ct. 551.
That perspective failed to give the appropriate deference to both trial counsel and the trial judge by recognizing that candor about the defendant's acts or history could be a reasonable strategy in some capital cases. What the Supreme Court further wrote in Nixon is applicable to this case:
Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 329 (1983). In such cases, "avoiding execution [may be] the best and only realistic result possible." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913, 1040 (2003).
Counsel therefore may reasonably decide to focus on the trial's penalty phase, *623 at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. See Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 Mercer L.Rev. 695, 708 (1991) ("It is not good to put on a `he didn't do it' defense and a `he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney."); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense); id., at 1597 (in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase). In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade." See Cronic, 466 U.S. at 656-657, n. 19[, 104 S.Ct. 2039]. Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys' lives, Darrow declared: "I do not know how much salvage there is in these two boys. . . . I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large." Attorney for the Damned: Clarence Darrow in the Courtroom 84 (A. Weinberg ed.1989).
Florida v. Nixon, 543 U.S. at 191-92, 125 S.Ct. 551 (footnote omitted).
The plain reality of the present case is that experienced trial counsel proceeded on the basis of a strategy which, from every indication in the record, counsel, based upon considerable experience in capital cases, believed at the time was a reasonable legal strategy in view of what strategies the facts made available to attempt to avoid his client being executed. In both this case and the Nixon case, counsel were representing clients who confessed to horrendous murders. Counsel recognized that candor with the jury was absolutely necessary, not just in the penalty phase of the proceedings but throughout the proceedings.
In the present case, there is no question that very experienced trial counsel made a studied decision. Counsel obtained the consent of the client. In hindsight in this case, as in Nixon, counsel's studied strategy can be criticized since it did not succeed. But success in this case, utilizing any strategy, was not probable. The fact that the strategy did not succeed does not equate to the strategy being unreasonable.
What the accepted test from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), teaches is that we should not use hindsight, but rather, we must give deference to counsel when counsel makes a studied decision in the heat of battle. Unfortunately, because of the murder this defendant confessed to committing, counsel had no good choices. I cannot find that counsel made a choice which no reasonable counsel would have made. Nor did the trial judge who heard the live testimony of counsel during the postconviction hearing make such a finding.
*624 For these reasons, I concur in the majority's decision and opinion.
CANTERO and BELL, JJ., concur.
PARIENTE, J., concurring in result only.
I agree with Justice Anstead that counsel did not operate as the counsel guaranteed by the Sixth Amendment in eliciting testimony by the defendant about the prior murders. However, I agree with the majority that there is no reasonable probability, sufficient to undermine confidence in the outcome, that this deficient performance resulted in a conviction of first-degree murder rather than second-degree murder. As we noted in the direct appeal, evidence of the Suzanne Henry murder was "inseparable crime evidence" properly admitted. Henry v. State, 649 So.2d 1361, 1365 (Fla.1994). Counsel's conduct in exposing the facts surrounding that murder and the prior second-degree murder does not undermine confidence in the jurors' rejection of the voluntary intoxication defense and verdict of guilty of first-degree murder. Accordingly, I concur in affirmance of the denial of postconviction relief.
ANSTEAD, J., dissenting.
This is an unusual and troubling case. In most of the cases we review on claims of ineffectiveness of counsel the claim is predicated on an allegation that defense counsel did not do enough, i.e., that counsel failed to do a proper investigation of the case and the defendant's background in order to provide a judge and jury with credible reasons to spare the defendant's life.[12] Today's case is the rare exception, where the claim is not that the lawyer did not do enough, but rather that the lawyer, by his affirmative choice, actually acted contrary to his client's best interests, and took actions that increased the likelihood of, if they did not ensure, his client's conviction. I cannot concur in the majority's determination that Henry's counsel acted effectively and competently in choosing to elicit severely damaging evidence from his client that would have otherwise not been admissible during the guilt phase of Henry's trial.
Defense counsel voluntarily put his client on the stand and elicited from him the extremely damaging facts that Henry had been convicted of second-degree murder for stabbing his first wife, Patricia Roddy, to death and had served only seven and a half years for that crime, and that he had already been convicted and sentenced to death for the murder of his second wife, Suzanne Henry. Further, and as if this was not damaging enough, a shocked and surprised prosecutor sought and obtained permission from the trial court to elicit in great detail on cross-examination all of the damaging circumstances surrounding the commission of these other killings. By choosing to voluntarily provide Henry's jury with this damning evidence of Henry's prior killings, defense counsel all but guaranteed his client's conviction in the instant case.
It is apparent that the decision to voluntarily put this damaging evidence before a jury charged with evaluating Henry's culpability for yet a third killing was not within any range of competent professional conduct by a qualified defense lawyer. As with the fundamental oath of physicians, surely defense counsel's first obligation to *625 his client is to do no harm. That obligation was directly violated here, and cannot be swept under the rug as a "tactical" call by counsel. Such "tactical decisions" have no place in our system of bifurcated trials for capital crimes. If the right to effective representation is to have any meaning at all, we cannot approve such malfeasance by counsel.

RIGHT TO THE ASSISTANCE OF COMPETENT COUNSEL
"The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case the right to assistance of counsel." Howell v. State, 877 So.2d 697, 702 (Fla.2004). In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court gave meaning to this right by holding that counsel must actually provide effective representation to a criminal defendant under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. In Strickland the United States Supreme Court stressed that because we have an adversarial system of justice which relies heavily on the vigorous advocacy and competence of counsel to ensure a just result, capital defendants are entitled to genuine adversarial testing at both the guilt and penalty phases of a capital trial. Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Moreover, counsel's actions, including "tactical" decisions, must be "reasonable considering all the circumstances." Id. Today's decision, approving blatant instances of ineffective representation in a death penalty case, constitutes a clear retreat from the promise of Strickland.
As the majority notes, "[a]n ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Shere v. State, 742 So.2d 215, 219 (Fla.1999) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). "The two prongs are related, in that `[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Howell, 877 So.2d at 702 (quoting Rutherford v. State, 727 So.2d 216, 219 (Fla.1998)).
I. Deficient Performance
The trial court was obviously troubled by the conduct of defense counsel and characterized this conduct several places in its order as "bad judgment."[13] Nevertheless, the trial court did not make a specific ruling concerning the first prong of the Strickland analysis, and instead ruled that *626 it was not necessary to rule on the first prong because Henry failed to prove prejudice under the second prong. The majority ignores these trial court references to "bad judgment" and instead substitutes its own factual analysis to conclude that counsel's conduct was reasonable and acceptable under prevailing professional norms. However, neither the factual record nor the law offers support for the majority's analysis and conclusion.
A. Henry's Voluntary Intoxication Defense
Initially, based upon counsel's investigation of the underlying facts of the case, counsel developed a defense strategy premised on voluntary intoxication after considering and rejecting a defense of insanity. No one challenges the efficacy of counsel's decision to adopt this defense. Voluntary intoxication was a recognized defense at the time of Henry's trial. Chestnut v. State, 538 So.2d 820, 822 (Fla. 1989) (noting "the long-standing rule in Florida that evidence of voluntary intoxication is admissible in cases involving specific intent"); Gurganus v. State, 451 So.2d 817, 822-23 (Fla.1984) ("When specific intent is an element of the crime charged, evidence of voluntary intoxication . . . is relevant.") (citing Cirack v. State, 201 So.2d 706 (Fla.1967); Garner v. State, 28 Fla. 113, 9 So. 835 (1891)).
Further, the underlying circumstances of the crime provided a substantial factual predicate for this defense. It appears clear from the record that several fact witnesses and three qualified doctors provided the jury with a strong case for the voluntary intoxication defense that was at least sufficient to make the question of whether Henry would have been convicted of first- or second-degree murder a close one.[14] All three of these medical experts provided detailed testimony and strong opinions that Henry was so intoxicated by the effects of cocaine that he was incapable of forming the specific intent required for a conviction of first-degree murder.[15] The *627 State presented only one expert to testify that he did not agree with these three doctors' conclusions regarding Henry's ability to form specific intent. Because of the persuasive evidence from the three doctors, Henry ordinarily would have had at least a chance of being convicted of second-degree murder, a lesser included homicide offense that does not require specific intent to kill. Nevertheless, this chance for an alternative homicide conviction and the life sentence that goes with it was obviously dashed by Henry's counsel's decision to tell this jury about a litany of other horrendous things Henry had done before and that another judge and jury had rejected his defenses and determined he should receive the death penalty.
B. The Voluntary Intoxication Defense's Demise
It is difficult to envision a more prejudicial moment in a criminal trial than a defendant personally telling the members of a jury the details of other horrific crimes he has committed. Such facts are so inherently prejudicial that Florida's evidence code law generally bars the admission of such facts except in extremely limited circumstances not involved here. Czubak v. State, 570 So.2d 925, 928 (Fla. 1990) (citing § 90.404(2)(a), Fla. Stat. (1987); Castro v. State, 547 So.2d 111, 114-15 (Fla.1989); Williams v. State, 110 So.2d 654 (Fla.1959)). The "inherent prejudice," of course, underlying this rule barring evidence of other crimes is the natural inclination a juror would have in concluding that "once a robber, always a robber," or as in Henry's case, "once a killer, always a killer." Heuring v. State, 513 So.2d 122, 124 (Fla.1987) ("Similar fact evidence that the defendant committed a collateral offense is inherently prejudicial. Introduction of such evidence creates the risk that a conviction will be based on the defendant's bad character or propensity to commit crimes, rather than on proof that he committed the charged offense.") (citing Keen v. State, 504 So.2d 396 (Fla.1987); Straight v. State, 397 So.2d 903 (Fla.1981)); see also Henrion v. State, 895 So.2d 1213, 1216-17 (Fla. 2d DCA 2005) (reversing a conviction and stating that the improper admission of collateral crimes evidence is presumed harmful error because of the danger that the jury will accept the collateral crime evidence as evidence of guilt of the crime being tried).
Further, when the defendant takes the stand, the law provides that the State must limit its inquiry of a defendant's prior record to asking if he or she has ever been convicted of a felony or a crime involving dishonesty. See § 90.610(1), Fla. Stat. (1991). If the defendant acknowledges such a record, there can be no inquiry into the details. See Hopkins v. State, 413 So.2d 443 (Fla. 3d DCA 1982) ("[T]he State was empowered to ask only whether the defendant had ever been convicted of a crime. . . .") (citing Whitehead v. State, 279 So.2d 99, 100 (Fla. 2d DCA 1973)).
Yet Henry's counsel ignored and abandoned the protections provided his client from the disclosure of such damning evidence of past criminal conduct, and chose to have Henry himself tell the jury about his horrendous record, disclosures that would seal Henry's fate in his current trial. In addition, these voluntary disclosures opened the door to further detailed questioning by the State on cross-examination *628 regarding the other murders. These other offenses immediately became the focus of the trial.[16] Further, because Henry's counsel introduced this evidence and opened the door to the State's cross-examination of Henry regarding the details of the other crimes, the State was able to destroy the legitimacy of the otherwise viable voluntary intoxication defense by delving into the details of the Roddy murder, which involved a stabbing when Henry was not under the influence of crack cocaine.[17]
In addition, by the voluntary disclosure of this information, the defense provided the State with a motive for the murder being tried, that Henry killed Eugene to eliminate him as a witness to his mother's stabbing, and that Henry, having been in prison before, did not want to return.[18] *629 During its cross-examination, the State explicitly laid out for the jury the fact that Henry had been to jail already for the Roddy murder and did not want to go back to jail, thereby developing a substantial motive for why Henry would have intentionally killed Eugene.[19]
Of course, even more severe prejudice ensued when the jury learned that Henry had not only been convicted of murdering Suzanne Henry but that another judge and jury had already determined that Henry qualified for the death penalty for that crime. In other words, another judge and jury had already considered and rejected any pleas by Henry to spare his life.[20] Certainly one of the many prejudicial effects of disclosing this death sentence to the jury was the danger that this jury would not feel the same responsibility for a life or death recommendation since another jury had already decided Henry should die.
Finally, no one denies, including the majority, that all of this damning evidence voluntarily disclosed by Henry was otherwise *630 inadmissible, and that under ordinary circumstances its admission over the objection of the defense would have surely denied Henry of a fair trial for this particular crime. See Heuring, 513 So.2d at 124.
In reviewing these matters, the trial court's order actually demonstrates in great detail the misjudgments of trial counsel and repeatedly characterizes defense counsel as having "exhibited bad judgment," but ambiguously and mistakenly suggests that Henry may not be entitled to relief because all of counsel's "tactical decisions" are completely immune from review regardless of their reasonableness. Now, on review, the majority ignores the trial court's assessment of counsel's conduct as "bad judgment," but embraces the flawed concept that counsel's "bad judgments" were "tactical decisions" immune to review. However, the reality is that there was simply no good reason for counsel to do what he did. If there was, we would have a different case.
Importantly, trial counsel's "tactical" decision to directly disclose past homicides to the guilt-phase jury does not give counsel a pass upon any postconviction review of counsel's performance. Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (holding that counsel's actions, including "tactical" decisions, must be "reasonable considering all the circumstances"); Schwab v. State, 814 So.2d 402, 411 (Fla.2002) (citing Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)) (stating that strategic decisions are not ineffective assistance if counsel's decision was reasonable); Wright v. State, 446 So.2d 208, 209 (Fla. 3d DCA 1984) (holding that "[w]hile a deliberate preemption of the prosecutor's projected cross-examination concerning the defendant's prior convictions is ordinarily a well-justified tactical decision," it was not in that case because the misdemeanor convictions defense counsel elicited on direct examination were all otherwise inadmissible).[21]
Under Strickland, there must be some rational basis in law or fact to support counsel's critical decisions. For example, we have already noted counsel's choice in the instant case to abandon an insanity defense in favor of a voluntary intoxication defense. There was a good reason for this since the experts equivocated on insanity whereas there was substantial evidence of intoxication. But there is no good reason for counsel's catastrophic decision to disclose the defendant's horrendous prior record. The record demonstrates without dispute that there is a complete lack of any rational connection between counsel's duty *631 to provide a competent defense in the case by the presentation of a voluntary intoxication defense, and the preemptive and irrational decision to voluntarily disclose the defendant's egregious history.
Perhaps the most intriguing aspect of defense counsel's testimony is that concerning his reasons for disclosing the fact that another judge and jury had already determined that Henry should be put to death for the earlier murder of his wife. The trial court's order sets this out:
With respect to the testimony elicited regarding the fact that defendant already received a death sentence for killing Suzanne Henry, at the October 17, 2003, evidentiary hearing, the following transpired on cross-examination:
HARRISON: Now, let me ask you this, sir. You also brought out to the jury in the guilt phase that he had beenI don't question the fact of the Suzanne Henry homicide, I know the Court has ruled that this was inextricably related to the Eugene Christian homicide, that is the fact of the case, but why in the world did you have to tell the jury, to bring it out through Mr. Henry, that he had already been sentenced to death for killing Suzanne?
FUENTE: Well, the thinking there was that would hopefully help them to accept the involuntary intoxication defense since they would have known that he had already been sentenced to death for another case.
HARRISON: Telling the jury that he had been sentenced to death for killing Suzanne would strengthen your voluntary intoxication defense?
FUENTE: It wouldit would hopefully persuade this jury to not sentence him to death for this homicide because of this defense in this case.
HARRISON: Well, how are those two situations related, that is, how is the fact that he had been sentenced to death for Suzanne's murder, how would that enhance your voluntary intoxication defense?
FUENTE: Hopefully, this jury would not be as disposed or as inclined to recommend death hadif they already knew he had been sentenced to death for homicide where there was no evidence that he was intoxicated at the time he killed her. The evidence was that he was intoxicated at the time he committed the second homicide.
(See October 17, 2003, Transcript, pages 113-115, attached).
After reviewing this portion of claim I, the testimony, evidence, and arguments presented at the October 17, 2003, evidentiary hearing, the court file, and the record, the Court finds that Judge Fuente made a tactical, strategic decision to elicit testimony from defendant that he had already received a death sentence for the murder of Suzanne Henry in an attempt to get the jury to accept the voluntary intoxication defense presented in this case.
Trial court order at 26-27. However, the same trial court order sets out the evidence of cocaine use presented at trial:
Judge Fuente further testified that defendant did testify on his own behalf at trial, testified that he used cocaine earlier that day at Grant's Pool Hall before the murder of Suzanne Henry, and testified that he spent about $200 on cocaine in Plant City. (See October 17, 2003, Transcript, pages 95-96, Trial Transcript, Volume V, pages 561-562, 565, 569-574, 577-578, 596-599, 615-619, attached). The record also reflects that Mr. Nathan Giles, Jr. and Ms. Sharon Toomer testified at trial that defendant had used cocaine earlier in the day at *632 Grant's Pool Hall. (See Trial Transcript, Volume VI, pages 746-748, 750-755, 763-766, 768-770, attached).
Trial court order at 16 (emphasis supplied). Hence, in addition to the incredibly damaging effect of counsel's disclosures on their face, his jury is now told directly that his voluntary intoxication preceded the killing of his wife and that another judge and jury have obviously rejected any claim that such intoxication should prevent his conviction or sentence of death. Under any reasonable assessment counsel's explanation that a jury's knowledge of a prior sentence of death would make them more sympathetic to a voluntary intoxication defense is patently unreasonable and simply strains credulity.
Counsel's suggestion that the jury would be less impacted at the penalty phase by first hearing of Henry's record at the guilt phase cannot withstand scrutiny, since it assumes the jury's rejection of Henry's defense while counsel is still presenting and advocating that defense. In fact, it makes no sense whatsoever to argue that a juror would be more inclined to believe a voluntary intoxication defense if he or she first learned that the defendant had stabbed his first wife to death when not intoxicated and had also been convicted of the first-degree murder of his second wife and was sentenced to death for that crime.[22] If anything, it would make a reasonable juror more skeptical of voluntary intoxication as a defense. Certainly counsel could not reasonably expect that a jury that saw the intoxication defense abandoned in the guilt phase would even consider it in the penalty phase. Indeed, at one point in the postconviction hearing, counsel candidly acknowledged he had made a serious mistake.[23] He was candid and he was right.
To his credit, counsel did not abandon his voluntary intoxication defense at the *633 postconviction hearing. Rather, he acknowledged its efficacy, especially in light of his further decision not to advance an insanity defense because of the equivocation of his experts. There was no such equivocation with the voluntary intoxication defense. In short, in a case where voluntary intoxication is a viable defense to first-degree murder, effectively giving up any chance for a second-degree finding in the guilt phase is not a reasonable tactic.[24] In fact, that chance represented Henry's only hope for life.
In an attempt to save counsel's "bad judgment," the majority cites Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), to support its conclusion. Majority op. at 617-18. However, this is like comparing apples and oranges. Not only is there no valid comparison between the cases, but there are many distinctions between the situation in Nixon and the situation here. First and foremost, in Nixon, there was no viable defense such as voluntary intoxication. 543 U.S. at 180-81, 125 S.Ct. 551. Nixon's counsel concluded "that Nixon's guilt was not `subject to any reasonable dispute'" and every court considering the case agreed with this assessment. Id. at 180-81, 181 n. 2, 125 S.Ct. 551. Further, Nixon *634 was disruptive and violent during the trial and was absent for almost all of the trial, which stands in stark contrast to Henry's cooperative behavior on the stand and throughout the trial. Id. at 182, 125 S.Ct. 551.
In Nixon, the United States Supreme Court noted, "Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. . . . [C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in `a useless charade.'" Id. at 191-92, 125 S.Ct. 551 (emphasis added) (citing United States v. Cronic, 466 U.S. 648, 656-57 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). The key words in this rule of law are "reasonably" and "useless charade." Those circumstances do not exist here. Henry's voluntary intoxication defense was not a "useless charade." Indeed, it was well supported by the evidence and the law. Hence, unlike Nixon, the circumstances here do not support a strategy of throwing in the towel during the guilt phase.
II. Prejudice
As noted, the trial court declined to rule on the first prong of Strickland and instead ruled that Henry suffered no prejudice by counsel's conduct. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The defendant is not required to show that the deficient performance "more likely than not altered the outcome in the case." Id. at 693, 104 S.Ct. 2052.
The prejudice Henry suffered in his trial by the admission of evidence of his collateral crimes is apparent. Our Williams rule law on collateral crime evidence demonstrates the prejudice. In fact, under our case law, prejudice is presumed. See, e.g., Straight, 397 So.2d at 908 (stating that evidence of other criminal activity "is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged"). That in fact is why the prosecution was shocked at defense counsel's action and was extremely cautious in getting assurance from the trial court that the door had now been opened to fully explore this evidence.
Of course, here we have defendant's own lawyer rather than the State improperly disclosing evidence of collateral crimes, but the prejudice remains the same. Defense counsel voluntarily established for the jury Henry's propensity to commit acts of extreme violence, and the prosecutor took full advantage of the opportunity to delve into the specific facts of the other murders and to emphasize the parallels between those murders and Eugene Christian's murder. Based on this evidence, the prosecution was further able to establish a malicious motive for the killing of Eugene Christian and a solid basis for a finding of specific intent and premeditation necessary for a first-degree murder conviction. A critical excerpt from the prosecution's closing argument vividly illustrates the prejudice:
Mr. Fuente also told you that the murder of Patrici[a] Roddy and the murder of Suzanne Henry are not a part of that case. That is not true. They are a part of this case. They are a part of this case because it is the motive, it is the reason, that Eugene Christian is dead. Because John Henry had the taste of *635 prison as a result of killing Patrici[a] Roddy. And he served his time for that and got out. And, then, when Suzanne Henry was murdered at his hand, he realized that going back to prison or perhaps worse would be his fate. And those two circumstances together, the first murder and the second murder, produced the motive for the killing of Eugene Christian. They are part of this case.
By voluntarily allowing the State and the jury to focus on Henry's horrendous prior record, the defense completely undermined the only viable defense it had, that of voluntary intoxication. In essence, counsel's decision relieved the State of its burden of proof and destroyed any chance for the defense.[25] Defense counsel provided the State with a conviction well before the case went to the jury, a conviction that would be immune to appeal but, under Strickland, not immune to postconviction scrutiny of counsel's conduct.

CONCLUSION
This Court's obligation, like that of the trial court, is to assess counsel's performance from an objective standpoint in determining whether counsel actually acted reasonably and competently and provided Henry with a genuine adversarial testing of his guilt or innocence. In my view, it is apparent that counsel first acted reasonably in choosing a voluntary intoxication defense. In fact, that was the defendant's only hope. But whatever hope that defense held was completely wiped out by counsel's subsequent decision to disclose the defendant's horrendous record to the same jury that would evaluate his voluntary intoxication defense.
As we have done in countless Williams rule cases over many decades, we should acknowledge the inherently prejudicial effect of counsel's ill-conceived actions, and permit Henry a trial where his defense can receive a fair hearing without the "inherent prejudice" brought on by counsel's disastrous decision, or as the trial court would say, "bad judgment."
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Henry was tried separately for Suzanne's and Eugene's deaths, in part because the deaths occurred in different counties. Henry's first trial for Suzanne's murder occurred in Pasco County shortly after his first trial for Eugene's murder. Henry was convicted and, after a unanimous jury recommendation, received a death sentence for Suzanne's murder. This Court reversed that conviction and sentence on appeal. Henry v. State, 574 So.2d 73, 74-76 (Fla.1991). It found that the cold, calculated, and premeditated (CCP) aggravator was not supported by the evidence, and the lower court erred in admitting evidence of Eugene's murder at the trial for Suzanne's murder. Id. The second trial for Suzanne's death took place on October 7, 1991. Henry was again found guilty and, after another unanimous jury recommendation, was sentenced to death. This Court affirmed that judgment and sentence in Henry v. State, 649 So.2d 1366 (Fla.1994), and affirmed the denial of a motion for postconviction relief. Henry v. State, 862 So.2d 679 (Fla.2003).
[3] The jury recommended the death sentence by a vote of ten to two.
[4] In Henry's first direct appeal of his conviction and sentence for Eugene's murder, Henry raised six allegations that this Court addressed. The first allegation claimed that the evidence did not support the finding that Henry had kidnapped Eugene, and the Court unanimously rejected this argument. Five allegations involved alleged trial court error in (1) failing to suppress the confession given after Henry told one detective he was "saying nothing" to him; (2) striking the insanity defense; (3) admitting evidence regarding Suzanne's murder at Henry's trial for Eugene's murder; (4) allowing the prosecution to impeach the defense mental health expert by asking how much of his practice was devoted to those convicted of first-degree murder; and (5) declining the jury's request to rehear the mental health expert testimony. Henry v. State, 574 So.2d 66, 69-71 (Fla.1991). The Court unanimously rejected Henry's third, fourth, and fifth allegations but split four to three, with a majority finding error sufficient to warrant a new trial on the first and second allegations.
[5] In this second trial, Henry relied on the defense of voluntary intoxication. He presented three lay witnesses (including himself) and three expert witnesses who testified that he lacked the specific intent to commit first-degree murder because he was under the influence of cocaine at the time of the killing.
[6] The aggravating factors were: (1) previous conviction for another capital felony and (2) that the murder was committed during the course of a kidnapping. Henry, 649 So.2d at 1363. These aggravating factors outweighed the mitigating factors, which were assigned "some weight" by the trial court. Id. at 1363-64. The statutory mitigators in this case were both mental health mitigators (i.e., that the murder was committed under the influence of extreme mental or emotional disturbance and impaired capacity to appreciate the criminality of conduct or conform to the requirements of the law). The six nonstatutory mitigators recognized that Henry (1) pled guilty and turned himself in for the murder of his first wife, Patricia Roddy; (2) cooperated with law enforcement officials; (3) exhibited good conduct in jail; (4) treated Eugene well when the child was alive and was remorseful for this crime; (5) had a history of drug and alcohol abuse; and (6) suffered brain damage from a childhood fall. Id. at 1364 n. 6.
[7] Henry claimed nine grounds for relief in his first direct appeal following his second conviction for Eugene's murder. Three of these claims alleged that the trial court erred in denying motions to (1) remove the state attorney and appoint a special prosecutor; (2) suppress the admission and statements made during custodial interrogation because of a remark made by Pasco County detective Fay Wilber; and (3) suppress Henry's confession, which was given after he told another detective he would not talk. Four of these claims alleged that the trial court erred in ways unrelated to motions filed by the defense, such as (4) allowing mention of Henry's conviction for Suzanne's murder and admitting evidence of her murder at the trial for Eugene's murder; (5) failing to read back the testimony of Dr. Berland, a defense expert witness; (6) failing to find the prosecutor's impeachment of Dr. Berland improper; and (7) giving the standard jury instruction on reasonable doubt. Finally, Henry's last two claims were general allegations that (8) Florida's aggravating factor of murder in the course of a felony is unconstitutional, and (9) the death penalty was disproportionate in this case. The Court rejected each of these arguments. Henry, 649 So.2d at 1364-65.

The only claim relevant to this postconviction appeal is the fourth claim. Henry asserted on direct appeal that the trial court erred in admitting evidence of Suzanne's murder at the trial for Eugene's murder. This Court unanimously rejected this claim, finding evidence of Suzanne's murder admissible because it was "inseparable" from the case at hand. Id. at 1365. This Court explained:
[T]he State was faced with proving that Henry premeditated the murder of [Eugene] and that [Eugene] was kidnapped rather than taken unlawfully. Henry, 574 So.2d at 70. Given this burden of proof, evidence from the Suzanne Henry murder was necessarily admitted to adequately describe the events leading up to [Eugene's] death. Further, the facts of Suzanne Henry's murder were so inextricably intertwined with [Eugene's] murder that to separate them would have resulted in disjointed testimony that would have led to confusion. Griffin v. State, 639 So.2d 966 (Fla.1994); Erickson v. State, 565 So.2d 328, 333 (Fla. 4th DCA 1990), review denied, 576 So.2d 286 (Fla.1991).
Id. at 1365.
[8] Huff v. State, 622 So.2d 982 (Fla.1993).
[9] The trial court found that Henry's lead counsel, William Fuente, had "extensive criminal experience both prosecuting and defending capital cases prior to representing [Henry]." Fuente testified that he spent five years in the state attorney's office where he handled many murder prosecutions and was eventually appointed division chief and special prosecutor. In 1980, twelve years before he defended Henry, he went into private practice as a defense attorney. His practice focused on state trial and appellate work, although he did some federal trial and appellate practice work as well. He testified that he had handled "between 10 and 15 capital cases" before representing Henry, and "probably 5 of these went to trial as death penalty cases." Two or three of the death penalty cases resulted in a sentence of death.
[10] See §§ 90.404(2)(a), 90.610, Fla. Stat. (2004) (stating that evidence of prior crimes is not admissible to establish propensity, but may be admissible to impeach a witness).
[11] United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
[12] Perhaps the classic case in that category is the lawyer that has not previously handled a death penalty case and has simply not properly educated himself or herself about the unique and complex issues presented in death penalty cases, combined with the heightened responsibilities of lawyers who accept representation in this most serious of all categories of criminal cases.
[13] On page 8 of the trial court's order denying postconviction relief the judge states:

The Court further finds that even if this Court finds that Judge Fuente's tactical decision exhibited bad judgment, defendant is not entitled to post conviction relief.
On page 20 of the order the judge states:
The Court further finds that even if this Court finds that Judge Fuente's tactical decision to disclose to the jury the fact that defendant only served half of his fifteen-year prison sentence exhibited bad judgment, defendant is not entitled to post conviction relief.
On pages 27-28 of the order the judge states:
The Court further finds that even if this Court finds that Judge Fuente's tactical decision to disclose to the jury the fact that defendant had already received a death sentence for the murder of Suzanne Henry exhibited bad judgment, defendant is not entitled to post conviction relief.
[14] It is also surprising that defense counsel had Henry take the stand to reveal his past murder convictions before any of the doctors who supported his voluntary intoxication defense took the stand. Any reasonable juror would have been very skeptical of any opinions the doctors had after Henry had just taken the stand to testify in detail as to his other homicides, including the stabbing death of his first wife where he was not intoxicated.
[15] Dr. Daniel Sprehe testified, "My opinion, at least with reasonable medical probability, is that he did have an impairment of his ability to form specific intent because of his use of cocaine." Regarding Henry's intent to actually kill Eugene Christian when he was stabbing him, Dr. Sprehe stated, "Well, he knew that eventually if he kept doing this, it would produce death, yes. But he, when he was stabbing him, he was just stabbing him without considering what it was going to produce." When asked to contrast Henry's specific intent with regard to the death of Suzanne Henry versus the death of Eugene Christian, Dr. Sprehe testified that Henry "knew what he was doing at all times" during the Suzanne Henry murder, but not the Eugene Christian murder.

Dr. Walter Afield testified regarding Henry's ability to form a specific intent to kill Eugene Christian: "I think that his ability was seriously compromised, if he even had the ability at all. I don't think he had the ability. I think he was, I think he was burned out on drugs. Craziness. And alcohol. I don't think he could form the intent at that time at all." In addition, Dr. Robert Berland testified in furtherance of his opinion concerning Henry's inability to form specific intent. He stated:
Well, it's my opinion that while he could obviously think of the act and apparently, at least, from his later report, thought about the act, that his state of mind at the time he did it was so contaminated by his mental illness, which was inflamed by ishe was in an acute psychotic state, and his report to me was that it was as a byproduct of cocaine use, whether it was cocaine use or not he appears to be a very unsophisticated person who gave a very accurate description of what people go through who are in an acute psychotic state that particularly may involve inflammatory effects of drugs, and that his actions were substantially a byproduct of that mental illness. Therefore, it was my opinion that he could not rationally and deliberatively, in a rational and deliberative way, form the specific intent to commit this act.
[16] In fact, the prosecutor in this case was shocked by defense counsel's action in disclosing Henry's past crimes, and, in an abundance of caution, asked the Court to confirm his right to now inquire about the details of the crimes:

Mr. Castillo: In an abundance of caution it's my feeling that Mr. Fuente at this point has opened the door to all three murders in terms of my cross-examination.
Mr. Fuente: No question.
Mr. Castillo: I just was very concerned about making an error at this point.
The Court: You wanted to make sure. You can ask about each and every one of them.
[17] 

Q. Mr. Henry, in response to Mr. Fuente's questions, you have already admitted to the jury that with Eugene Christian's death, your total number of people that have been killed at your hand now numbers three; is that correct?
A. Yes, sir.
Q. And the first of your victims was Patrici[a] Roddy in 1975; is that correct?
A. Yes, sir.
Q. And the circumstances by which Patrici[a] Roddy was killed at your hand was that she was stabbed repeatedly in the chest and neck area, was she not?
A. I was told that, yes, sir.
Q. You don't have a recollection of having done that?
A. The incident? Yes, sir.
Q. That is where you stabbed her. Wasn't it in the throat and in the chest?
A. That is what I were told, sir.
Q. You did that repeatedly, didn't you? There were numerous stab wounds to her chest and neck area, weren't there?
A. That is what I were told, sir.
Q. There were repeated stab wounds to her arms where she fended you off from this attack, wasn't there?
A. I heard that, yes, sir.
Q. As a matter of fact, you had one gash in her arm so bad it almost cut her hand off; isn't that true?
A. I don't know, sir.
Q. Do you remember how many times you stabbed Patrici[a] Roddy to death before you killed her?
A. No, sir.
Q. Patrici[a] Roddy's murder occurred in the automobile that you and she were in, didn't it?
A. Yes, sir.
Q. And you and she were not the only people in that car in 1975, were you?
A. Yes, we was.
Q. There wasn't some children in the back seat of the car, Mr. Henry?
A. No, sir.
Q. You are sure about that?
A. I am positive.
. . . .
Q. Now, in that 1975 murder, you were not under the influence of cocaine when you killed Patrici[a] Roddy, were you?
A. I was under the influence of alcohol.
Q. Alcohol?
A. Yes, sir.
Q. The disposition of the case is that you received a fifteen-year sentence; isn't that right?
A. Yes, sir.
Q. And you were released in 1983 from that fifteen-year sentence?
A. Yes, sir.
[18] 

Q. Were you worried that if it was the police they may stop you and then find Eugene Christian in the car with you and began to unravel the murder of Suzanne Henry?
A. No. I was under the impression if I was stopped, it was possible that they would find the cocaine in my possession.
Q. You weren't worried at all about the Suzanne Henry murder?
A. Worried? What you mean, worried?
Q. You weren't worried the police may have arrested you for that murder?
A. Sir, eventually, I would have gotten arrested. But it was my intention also to turn myself in.
Q. But you never did that, did you?
A. No, it didn't get to that.
Q. Does Eugene Christian know your voice or did he know your voice?
A. He had spent better than twelve years around me.
Q. Do you think Eugene Christian knew your voice?
. . . .
A. Yes, sir.
Q. You think he knew your voice, didn't he?
A. It's possible he knew my voice.
Q. Is Eugene Christian able to recognize you when he saw you?
A. Yes, sir.
Q. He knew who you were, didn't he?
A. Sure, he knew who I was.
[19] 

A. I was out of jail right at three years before Suzanne's death.
Q. Now you had testified that you had been to prison as a result of killing Patrici[a] Roddy; isn't that true?
A. I had been to prison for the death of Patrici[a] Roddy, yes, sir.
Q. And you did not want to go back to prison for thatwell, you didn't want to go back to prison again, did you?
A. Who wants, who wants to go to prison?
Q. You knew that if you were convicted of the murder of Suzanne Henry, you would go back to prison, didn't you? At the very least, you would go back to prison?
A. I am aware of that, yes, sir.
Q. And you were aware of that when you took Eugene Christian from the room in his home with Suzanne Henry, weren't you?
A. Took? I carried him. I didn't take him.
Q. But you knew that?
A. Knew what?
Q. That if you were convicted of the murder of Suzanne Henry, that you would end up at the very least in prison again?
A. If I were convicted of Suzanne.
. . . .
Q. Mr. Henry, as much as perhaps you hated to do it, it was the choice of staying out of prison or the electric chair or the life of Eugene Christian, and Eugene came up short?
A. No, sir, it wasn't a choice. That was something that happened that shouldn't never have happened.
Q. In your mind two murders was no different than three?
A. No, sir, that wasn't in my mind.
Q. Isn't it true, Mr. Henry, that you killed him in the same manner that you killed Suzanne Henry and Patrici[a] Roddy, the way you know to be effective?
A. What?
Q. By stabbing in the throat?
[20] 

Q. As you are on the witness stand, now, you are under a death sentence from Pasco County?
A. Yes.
Q. For the murder of Suzanne Henry?
A. Yes, sir.
[21] This writer has no qualms in conceding that it may sometimes be in a defendant's best interest to admit shortcomings or even concede guilt in order to focus on the penalty phase of a capital trial. See Florida v. Nixon, 543 U.S. 175, 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) ("Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared."); Yarborough v. Gentry, 540 U.S. 1, 9, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (holding that admitting a defendant's shortcomings during the defense's closing argument did not constitute ineffective assistance of counsel and stating that "[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case"); Gamble v. State, 877 So.2d 706, 713-15 (Fla. 2004) (holding that defense counsel conceding during his opening statement that the defendant was guilty of second- or third-degree murder but not first-degree murder did not constitute ineffective assistance of counsel).

But such circumstances simply do not exist here. When the defense presents a well-substantiated and viable voluntary intoxication defense, it simply defies logic for the defendant to tell the jury himself the details of his otherwise inadmissible past crimes. Obviously, such disclosures would naturally tend to undermine, rather than bolster, an otherwise credible and legal defense.
[22] It is true that this Court unanimously held that evidence of Suzanne Henry's murder was admissible in the present trial for Eugene Christian's murder because "the facts of Suzanne Henry's murder were so inextricably intertwined with Christian's murder that to separate them would have resulted in disjointed testimony that would have led to confusion." Henry v. State, 649 So.2d 1361, 1365 (Fla.1994) (citing Griffin v. State, 639 So.2d 966 (Fla.1994); Erickson v. State, 565 So.2d 328, 333 (Fla. 4th DCA 1990)). However, the fact that Henry had been sentenced to death for the murder of Suzanne Henry would not have been admissible if defense counsel had not elicited it from the defendant. See § 90.610(1), Fla. Stat. (1991) ("A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable by death. . . .") (emphasis added). Because Henry's counsel elicited more than the bare-bones facts of the Suzanne Henry murder case, the State was able to delve into greater and more prejudicial detail regarding that murder and the Patricia Roddy murder. See McCrae v. State, 395 So.2d 1145, 1152 (Fla.1980) ("(T)he rule limiting the inquiry to the general facts which have been stated in the direct examination must not be so construed as to defeat the real objects of the cross-examination. One of these objects is to elicit the whole truth of transactions which are only partly explained in the direct examination.") (quoting 4 Spencer A. Gard, Jones on Evidence § 25:3 (6th ed.1972)); Leonard v. State, 386 So.2d 51, 52 (Fla. 2d DCA 1980) ("We agree that further inquiry by the prosecutor would have been proper had defense counsel `opened the door' by inquiring into the circumstances or dates of any of the crimes, or by inquiring into the nature of one or two of appellant's prior convictions. . . . ").
[23] Former defense counsel made this statement as he was testifying regarding the disclosure of defendant's earlier homicide conviction and prison sentence:

Well, my answer to that question now is it wouldn't serve any purpose at all. I can't tell you why I did that, other than just in the interest of being completely candid. I know that he got out of prison a certain time and committed these new offenses within a matter of a year or two thereafter.
[24] The majority also points to Shere, 742 So.2d 215, as supportive to its holding that Henry's counsel's actions were not unreasonable. Majority op. at 619. In Shere, this Court held counsel to be not ineffective for offering evidence of a codefendant's admission to the murder during the guilt phase when the State had presented during its case-in-chief damaging evidence that the defendant had given several inconsistent statements after his arrest and there was no "doubt that the defendant played a major role in the murder and subsequent coverup." Id. at 220 (quoting trial court's order). This Court held that counsel had made a tactical decision after considering every alternative carefully, and therefore, the defendant's ineffective assistance of counsel claim was meritless. Id. (citing State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987)). This Court further stated:

Although this strategy may appear futile, this court has seen weaker arguments prevail in front of a jury of untrained citizens. Finally, the fact that introducing portions of the codefendant's statement opened the door to other inculpatory evidence was not of much consequence given the fact that the defendant's statements to law enforcement and his friends were already before the jury and those statements portrayed him as a cold and ruthless killer.
Id. (quoting trial court's order). However, the same cannot be said for Henry's case. Without counsel's pre-emptive disclosures, the State was forbidden from delving into the areas of examination that Henry's counsel elicited from Henry on direct examination, unlike the Shere defendant's statements being introduced by the State during its case. While counsel in both cases may have been experienced in capital cases, this does not diminish the factual distinctions between the two cases.
Similarly, the majority relies on Atwater v. State, 788 So.2d 223 (Fla.2001), to support its conclusions that Henry's counsel was not ineffective because this "Court found that defense counsel was not deficient for conceding defendant's guilt to second-degree murder in its closing argument and supporting this concession by showing photographs of the crime scene to the jury." Majority op. at 620. It is true that counsel in both cases believed there was no chance of acquittal. However, if Henry's counsel had simply performed just as counsel in Atwater did, in that he conceded guilt to second-degree murder and showed crime scene photographs, there would be no merit to Henry's claim that he received ineffective assistance of counsel. Unfortunately, Henry's counsel took many steps past simply conceding guilt of second-degree murder as defense counsel in Atwater had done. Similarly, in McNeal v. Wainwright, 722 F.2d 674 (11th Cir.1984), the federal appeals court held that counsel was not ineffective in making a tactical decision to admit guilt of manslaughter before the jury nevertheless convicted the defendant of first-degree murder. Id. at 676. If Henry's counsel had only conceded to a lesser-included crime, which the voluntary intoxication defense would have supported, then there would be no dispute regarding counsel's effectiveness.
[25] Counsel's decision also flies in the face of our bifurcated trial system for capital crimes, in which less evidence of a defendant's past record is permitted in the guilt phase than in the penalty phase for exactly the reason that is illustrated here: it is simply too prejudicial to allow evidence of previous crimes to infect the minds of jurors who are deciding a matter of guilt or innocence that could result in the end of a human life. See § 921.141(1), Fla. Stat. (1991) ("Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. . . ."); Buford v. State, 492 So.2d 355, 358 (Fla.1986) ("[U]nder Florida's bifurcated capital sentencing scheme, the sentencing judge and the reviewing court determine whether the defendant was convicted under circumstances which would prohibit imposition of the death sentence.") (citing Brown v. State, 473 So.2d 1260, 1265 (Fla. 1985)).