# Supreme Court of Florida

———————

No. SC14-1796
———————

**JUSTIN RYAN MCMILLIAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 13, 2017]

PER CURIAM.

Justin Ryan McMillian appeals an order of the trial court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851. For the reasons that follow, we affirm the denial of his guilt phase claims but remand for a new penalty phase pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017).[1]

———————

1. This Court has jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we are remanding for a new penalty phase, we do not address the penalty phase claims raised in the appeal of the denial of McMillian's postconviction motion.

# I. BACKGROUND

On direct appeal, this Court described the facts as follows:

The defendant, Justin McMillian, and his victim, Danielle Stubbs, began dating in the spring of 2008.  On Wednesday or Thursday, January 6 or 7, 2009, Stubbs moved from an apartment into a nearby townhouse on Pineverde Lane in Jacksonville.  McMillian assisted Stubbs and her family with the move.  Friday afternoon, Stubbs took McMillian and her mother to lunch at Olive Garden as a thank-you for helping with the move.  There, McMillian told Stubbs' mother that he and Stubbs were breaking up, that he was quitting his job, and that he was going back to Georgia [to] spend time with and take care of his two children.

Saturday night, Stubbs left her townhome and drove to a coworker's apartment so that the two could then be driven by Allen Morris, another coworker, to a beachside nightclub.  At the nightclub, Stubbs consumed several alcoholic beverages, became intoxicated, and, at some point, had sexual intercourse with Morris in the back of Morris' car.

Morris, Stubbs, and the coworker left the nightclub around 2:45 a.m. on Sunday, January 11.  Morris first drove the coworker back to his apartment and had to stop a couple of times on the way to allow Stubbs to vomit.  After dropping off the coworker, Morris drove Stubbs home because she was too inebriated to drive her own car.  A few minutes from Stubbs' townhouse, at around 3:30 a.m., Morris stopped to get Stubbs something to eat in an effort to settle her stomach.  From there, he drove Stubbs to her townhome.  Initially, and at Stubbs' request, Morris drove down Stubbs' street past her townhouse, and stopped for a few minutes to allow Stubbs to eat some food and to compose herself.  Morris then dropped Stubbs off in front of her townhouse, watched her walk past McMillian's Cadillac, which was backed into Stubbs' driveway, and drove away after she waved.  Other than the defendant, Morris was the last person to see Stubbs alive.

Stubbs had plans with her mother during the day Sunday.  When Stubbs' family could not reach her by phone throughout the morning and into Sunday afternoon, they became increasingly alarmed and began to actively search for her by calling around to her friends and going to her townhome and recently emptied apartment.

At one point that morning, McMillian called Stubbs' mother to say that he could not find Stubbs and to inquire as to whether the family knew where she was. That evening, McMillian called again to say that he still could not find Stubbs. Stubbs' parents and younger brother eventually called the police Sunday evening to report Stubbs missing and then drove to her townhome. Upon arriving and finding the front door locked, Stubbs' father and brother went around to the back of the townhome while Stubbs' mother waited at the front door.

Stubbs' brother and father discovered that the sliding glass door at the rear of Stubbs' townhome was unlocked. Stubbs' brother immediately went inside, ran upstairs, and began screaming. Stubbs' father went to the front door, unlocked the doorknob and the deadbolt, let his wife in, and went upstairs with her. There, they found Stubbs dead in a pool of blood. She had been shot through the arm and the top of the head. Stubbs' parents immediately called 911 and were waiting outside when the police, who were already en route due to Stubbs' parents' earlier call to report Stubbs missing, arrived minutes later.

The police recovered several important pieces of evidence from Stubbs' bedroom. An unfired .45 caliber cartridge was found on the floor just inside the doorway to Stubbs' bedroom. Further inside Stubbs' bedroom, at the foot of her bed and beside her dresser/TV stand, a fired .45 caliber shell casing was recovered. Another fired .45 caliber shell casing was recovered from the floor beside Stubbs' body on the side of the bed furthest from the bedroom door. Stubbs' bedding was bloodstained and had holes in it which were consistent with being caused by fired bullets. A fired .45 caliber bullet, later matched to McMillian's pistol, was also found lying on top of Stubbs' bedding.

Stubbs' autopsy confirmed that Stubbs was shot once through the right arm and once in the top of the head and was alive when both shots were fired. The shot to the head likely would have immediately rendered Stubbs unconscious and likely would have killed her within seconds, though it is possible that she survived for as long as a couple of minutes. The bullet that killed Stubbs was recovered from her skull and was later matched to McMillian's gun.

The day after the murder, McMillian called the Jacksonville Sheriff's Office (JSO) and said that his girlfriend had been found dead in her apartment and he wanted to speak with someone about her case. He also said that he had been in Georgia since 3 a.m. the morning of

the murder. A detective called McMillian back shortly thereafter. In that conversation, McMillian stated that he had last seen Stubbs around 6 the night before the murder and had last spoken to her on the phone around 9 p.m., before she went out with her coworkers. McMillian also said that he was about to return to Jacksonville and would meet the detective at the station. When McMillian failed to show, the detective contacted a special task force to have him brought in.

Two days later, the task force saw McMillian and two other men leave a Jacksonville house in McMillian's Cadillac. The task force followed McMillian, with an unmarked SUV initially leading several trailing task force vehicles. Shortly thereafter the lead was passed off from the SUV to a marked JSO K-9 unit so that a traffic stop could be initiated. Once the marked unit was behind McMillian, it turned on its lights and siren, but McMillian continued driving as though nothing were happening. After a short distance, McMillian turned onto a side street and abruptly stopped without pulling off the road. As McMillian was coming to a stop, the two passengers opened the passenger side car doors and ran a short distance from the vehicle before going to the ground.

At this point, as the K-9 officer was getting out of his patrol car, McMillian exited his vehicle, reached behind his back, pulled a .45 caliber semi-automatic pistol, and began to fire at the K-9 officer. . . . The task force members returned fire at McMillian as he fired and fled from his car on foot. McMillian ran a short distance down the street and then ran between two houses, causing the task force members to lose sight of him. McMillian was found between those two houses, having collapsed due to multiple gunshot wounds.

Police recovered several pieces of evidence from the scene of the shootout, including McMillian's semiautomatic .45 caliber Desert Eagle pistol, two .45 caliber bullets which struck the JSO K-9 patrol car in the driver's side headlight and in the driver's door, an unfired .45 cartridge, and spent .45 shell casings.

From the evidence collected at the scenes of the shootout and Stubbs' murder, it was determined that McMillian's gun was used to murder Stubbs. During the course of their investigation into Stubbs' murder, police also obtained a security video from a convenience store near Stubbs' townhome as well as phone records for Stubbs' cell phone and the convenience store pay phone. The video and records show that on the morning of Stubbs' murder, at around 4:05 a.m.,

- 4 -

McMillian entered the store, got change, and used the pay phone to make two calls, each of which lasted approximately one minute, to Stubbs' cell phone. The records also show that Stubbs made a two-second long return call from her cell phone to McMillian at the pay phone at approximately 4:08 a.m.

A couple of weeks after the shootout, two detectives from Stubbs' murder investigation went to the hospital to interview McMillian. Prior to going in to see McMillian, the detective spoke to a nurse, who stated that the only medication McMillian was receiving was Motrin. After waiving his <u>Miranda</u> [N1] rights, McMillian first repeated his story that the last time he saw Stubbs was on Saturday evening before she went out with her coworkers and that he had gone to a bar with his sister, left the bar around 1:30 a.m., drove his sister home, and left for Georgia around 2:00 a.m. The detectives then told McMillian that their investigation had determined that his gun was the same gun used to kill Stubbs. McMillian then admitted that he was sitting in his car in Stubbs' driveway when she came home and claimed that he went inside with her. McMillian claimed that he and Stubbs had intercourse on her couch and then went upstairs and got in bed. McMillian then claimed that was when he "lost it" and stated that he shot Stubbs while she was sleeping in the bed, and then shot her again after she rolled out of the bed and onto the floor on the far side of the bed. McMillian also said that he knew that Stubbs was dead when he left the apartment and that her body was on the side of the bed farthest from the bedroom door. McMillian also stated that he did not have his own key to the townhome and that after shooting Stubbs, he went out the front door and closed it behind him.

[N1.] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

In his guilt phase defense, McMillian testified differently. He stated that he had spent the day before the murder at a racetrack in Valdosta and returned to Stubbs' townhome around 5 p.m. He claimed that he and Stubbs had intercourse, he left, and Stubbs went out with coworkers. Later that night, he went to a bar with his sister and took her home around 2:30 or 3 a.m. After dropping off his sister, McMillian drove to Stubbs' townhome because he had some belongings that he wanted to pick up before leaving for Georgia. McMillian claimed that he was sitting in his car in Stubbs' driveway when Stubbs got home, that she invited him inside, and that they again

had intercourse on her couch before going upstairs.  McMillian claimed that, once upstairs, Stubbs got upset about his plans to leave to see his children in Georgia and then to return to work as a contractor in Iraq.  McMillian claimed that Stubbs then told him that she had slept with the coworker who had dropped her off earlier that night, which upset but did not anger him.  McMillian claimed that the two lay in the bed for a while before he got up to get dressed and leave for Georgia.  McMillian testified that, on his way out the bedroom door, he grabbed his pistol from the dresser/TV stand beside the bedroom door and put it in his waistband.  Finally, McMillian claimed that as he was leaving, Stubbs said that she had known he would leave and had aborted his unborn child, which caused him to pull his gun and fire toward the bed in the darkness.  When asked about the convenience store video, McMillian claimed that he panicked, left out the front door, drove to the convenience store, called Stubbs to see if she was okay, did not get an answer, and then left for Georgia.

On cross-examination, the State attempted to elicit further details from McMillian regarding how he came to shoot Stubbs. McMillian stated that he did not have to load his gun before firing because he always kept it loaded and that all the shots were fired from the doorway.  McMillian also admitted that the first time he had mentioned Stubbs' abortion was during the trial, which was after he had seen a receipt for an abortion that the police recovered from Stubbs' purse at the murder scene.

After hearing the prosecution's case in rebuttal and closing arguments, the jury found McMillian [ ] guilty of premeditated first-degree murder for the killing of Danielle Stubbs and of attempted second-degree murder for shooting at the K-9 officer.

McMillian's penalty phase was held June 30, 2010. . . .

In mitigation, McMillian first presented Dr. Krop, a mental health expert, who testified that he had met with McMillian on several occasions, met with McMillian's family, read depositions related to the case, and reviewed medical and school records and police reports. Dr. Krop also conducted a battery of psychological and neuropsychological testing on McMillian which revealed that McMillian had mild to moderate impairment of his frontal lobe function.  However, Dr. Krop could not state whether these impairments predated the murder because they could have been caused by blood loss or a shot to the head that McMillian suffered in

his shootout with police. Dr. Krop also testified that there were records that McMillian had sustained a concussion without loss of consciousness in a 2006 car crash, but that CAT scans taken at the time were negative for physical brain damage. He also explained that McMillian was in the borderline range of mental function with an IQ of 76 and had abused alcohol in the year leading up to the murder. Ultimately, Dr. Krop stated that he did not believe that McMillian suffered from any diagnosable mental illness or psychiatric disorder, but did believe the shooting was caused by McMillian reacting while in a highly emotional state.

On cross-examination, Dr. Krop stated that McMillian lied to him in their initial interview and denied responsibility for Stubbs' murder by claiming that he arrived at Stubbs' house, found her dead, took his gun from the bed, and fled. However, in a subsequent interview, McMillian gave Dr. Krop another version of events. . . .

McMillian's father testified that he had obtained custody of McMillian from McMillian's biological mother because she could not care for him adequately and that McMillian grew up feeling that his mother did not love him or care for him as much as she should. McMillian's father also testified that, while McMillian could have had learning disabilities as a child, the fact was never determined conclusively because McMillian's father did not believe in them. He also explained that McMillian struggled in school and that he was able to get an expulsion, imposed for fighting, rescinded so that McMillian could transfer to a Georgia high school and graduate. Other family members and friends testified that McMillian is very close with and is dearly loved by his family and also is a good father who loves his children and who would continue to play a positive role in their lives from prison. Following the defense's presentation of mitigation evidence, the jury recommended death by a vote of 10-2.

A Spencer[N2] hearing was held August 27, 2010, but neither side presented any additional information. On October 1, 2010, the trial court, following the jury's recommendation, sentenced McMillian to death based on its determination that [ ] the two established aggravators[N3] outweighed one statutory mitigator[N4] and seven nonstatutory mitigators.[N5]

[N2.] Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 7 -

[N3.] The aggravators were prior violent felony based on McMillian's conviction for attempted second-degree murder for shooting at a police officer (great weight) and felony probation stemming from McMillian's felony fleeing and eluding offense in Georgia (great weight).

[N4.] The trial court found that McMillian did not have a significant history of prior criminal activity and gave this mitigator "little weight." The trial court explained that evidence was presented throughout both phases of the trial that McMillian had a history of fighting in school, was regularly in trouble with police for driving with a suspended license, and had a felony fleeing and eluding charge. The trial court stated that "the Defendant's prior criminal activity, while not in the nature of violent felony convictions, substantially reduces the weight of this mitigating circumstance."

[N5.] The trial court found that: (1) McMillian was raised in the church (very slight weight); (2) McMillian loves and is loved by his family and friends (little weight); (3) McMillian has a consistent history of employment (little weight); (4) McMillian's biological mother was not an active participant in his upbringing (slight weight); (5) McMillian has an IQ of 76 (little weight); (6) McMillian behaved appropriately during trial (slight weight); (7) McMillian suffered from some mental or emotional distress at the time of the murder (some weight).

McMillian v. State, 94 So. 3d 572, 574-79 (Fla. 2012) (seven footnotes omitted).

This Court affirmed McMillian's conviction and death sentence on direct appeal, concluding that "competent, substantial evidence supports McMillian's conviction for premeditated first-degree murder," and rejecting McMillian's claims that "the trial court erred in denying his motion for a judgment of acquittal for

premeditated first-degree murder and that his death sentence is disproportionate."

Id. at 579, 583. Thereafter, the United States Supreme Court denied McMillian's petition for writ of certiorari. McMillan v. Florida, 133 S. Ct. 1260 (2013).

McMillian filed a motion for postconviction relief on September 16, 2013, which the trial court denied after holding an evidentiary hearing.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE

McMillian raised multiple claims of ineffective assistance of counsel during the guilt phase involving a statement he made to law enforcement and consolidation of his cases, which the trial court denied after an evidentiary hearing. We affirm.

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court explained that two requirements must be met for ineffective assistance of counsel claims to be successful:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of Strickland, there is a strong presumption that trial counsel's performance was not ineffective. Strickland, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Regarding the prejudice prong of Strickland, "the defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' " Henry v. State, 948 So. 2d 609, 617 (Fla. 2006) (quoting Strickland, 466 U.S. at 695). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Id. (quoting Strickland, 466 U.S. at 694).

"Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012).

## A. McMillian's Statement to Law Enforcement

McMillian raises three challenges involving an inculpatory statement he made to law enforcement when he was still hospitalized from a shootout with police after the murder. Specifically, he claims that trial counsel was ineffective for the following: (1) failing to file a more comprehensive motion to suppress and failing to present witnesses to explain McMillian's medical condition at the time his statements were made; (2) failing to argue at the suppression hearing that, because law enforcement violated the right to counsel that had attached to the attempted second-degree murder charge related to the shootout with police, the entire statement should have been suppressed; and (3) failing to move to redact statements made by law enforcement during their recorded interview of McMillian, which was played for the jury at trial. However, we affirm the trial court's denial of these claims.

On the day of the shootout on January 14, 2009, and while McMillian was still hospitalized at Shands Hospital in Florida, the public defender's office was appointed to represent McMillian for the attempted second-degree murder charge relating to the shootout. On numerous occasions, investigators from the public defender's office and law enforcement were turned away when they attempted to have contact with McMillian at the hospital because McMillian was unconscious. On January 29, 2009, Detectives Wolcott and McLean were allowed to visit

McMillian at the hospital for purposes of conducting an interview. Subsequently, McMillian was arrested on February 2, 2009, for the murder of Danielle Stubbs.

Before trial, counsel filed a motion to suppress McMillian's statements that the detectives obtained at the hospital, and the trial court denied the motion after holding a hearing during which both detectives testified. Then, prior to the State's introducing the recorded statement during Detective Wolcott's testimony at trial, counsel renewed his motion to suppress the statements McMillian made during the recorded interview, but the trial court denied counsel's renewed motion.

### (1) Motion to Suppress and Evidence of McMillian's Medical Condition at the Time of the Statement

Regarding his claim that trial counsel was ineffective for failing to file and present a more comprehensive motion to suppress by failing to present witnesses to explain McMillian's medical condition at the time his statements were made, McMillian has failed to demonstrate deficiency. Although McMillian argues that trial counsel should have presented additional witnesses, such as doctors or nurses, the record demonstrates that trial counsel did present information regarding McMillian's injuries, hospitalization, and medication usage. See Patterson v. State, 513 So. 2d 1257, 1260 (Fla. 1987) (holding that even though the defendant was in a weakened physical condition, the confession was voluntarily given because there were no threats of violence and the detective read Patterson his

Miranda rights and Patterson indicated that he understood his rights and signed a waiver of rights form).

Moreover, McMillian has failed to demonstrate prejudice. Given the nature and extent of the evidence presented at trial proving McMillian's guilt, such as the fact that his firearm was used to kill Danielle Stubbs, the fact that his vehicle was seen at Danielle Stubbs' home hours before her death, the fact that he was the last person with her, and the testimony that Danielle Stubbs had just ended their relationship, there is not a reasonable probability that absent trial counsel's failure to have McMillian's statements to law enforcement suppressed, there would have been a different result. See Henry, 948 So. 2d at 617. In other words, confidence in the outcome is not undermined.

### (2) Right to Counsel

Next, McMillian submits that trial counsel was ineffective for failing to argue at the suppression hearing that, because law enforcement violated the right to counsel that had attached to the attempted second-degree murder charge, the entire statement should have been suppressed. However, trial counsel cannot be deemed ineffective for failing to raise a meritless basis to suppress McMillian's confession.

The Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings, including police questioning. Montejo v. Louisiana, 556 U.S. 778, 786 (2009) (quoting United

- 13 -

States v. Wade, 388 U.S. 218, 227 (1967)).  However, the Sixth Amendment right to counsel is offense-specific.  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991).  "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' "  Id. (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)).

In Owen v. State, 596 So. 2d 985 (Fla. 1992), this Court discussed the right to counsel when more than one offense is involved.  After the body of the victim Georgianna Worden was discovered, "Owen was arrested the following day on unrelated charges . . . ."  Id. at 986.  He was interrogated over the next several weeks and eventually confessed to the murder of Worden.  Id.  This Court discussed that Owen's right to counsel had attached and been invoked on the initial charges by the time of his first appearance on the initial charges, but this fact was "unrelated to his rights concerning the Worden murder."  Id. at 989.  Specifically, "[h]is rights on the murder charge attached when he attended first appearance on that offense."  Id.  Therefore, this Court held that "[b]ecause the questioning session during which he confessed took place prior to this first appearance [for the murder charge], Owen had no Sixth Amendment right to counsel at that time."  Id.

- 14 -

Moreover, the right to counsel "may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." Montejo, 556 U.S. at 786. "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." Id. Furthermore, "[w]hen a court appoints counsel for an indigent defendant in the absence of any request on his part, there is no basis for a presumption that any subsequent waiver of the right to counsel will be involuntary." Id. at 789.

In this case, the right to counsel had only attached to the attempted second-degree murder charge. The court appointed counsel to represent McMillian for the attempted second-degree murder charge on January 14, 2009, the day of the shootout with police. The detectives' interview with McMillian took place on January 29, 2009, but McMillian was not arrested for Danielle Stubbs' murder until February 2, 2009. Accordingly, because the Sixth Amendment right to counsel is offense-specific, the right to counsel had only attached to the charge of attempted second-degree murder at the time of the interview. See McNeil, 501 U.S. at 175.

Moreover, McMillian waived his right to have counsel present during the detectives' questioning on January 29, 2009, when he was still in the hospital. Before the detectives began the interview, the charge nurse advised the detectives that McMillian was just taking Motrin, and McMillian confirmed this himself.

- 15 -

Additionally, the detectives testified at the suppression hearing that McMillian had a calm demeanor, was able to communicate, they could understand each other, the detectives did not threaten or make any promises to McMillian for his statements, and McMillian indicated that he understood his Miranda rights and signed a waiver of rights form. As the trial court concluded in denying trial counsel's motion to suppress, considering the totality of the circumstances, this was a voluntary, knowing, and intelligent waiver of his constitutional rights. See Montejo, 556 U.S. at 789 (holding that when court appoints counsel, there is no presumption that any subsequent waiver of right to have counsel present during interrogation is invalid). Accordingly, because McMillian's claim is without merit, counsel was not ineffective for failing to raise it. See Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992) ("Counsel cannot be deemed ineffective for failing to make this meritless argument."), receded from on other grounds by Deren v. State, 985 So. 2d 1087, 1088 (Fla. 2008).

### (3) Failure to Redact Law Enforcement's Statements

Finally, McMillian claims that trial counsel was ineffective for failing to move to redact statements made by law enforcement during their recorded interview of McMillian, which was played for the jury at trial. This Court has recognized that a jury may hear an interrogating detective's statements about a crime when they provoke a relevant response from the defendant being questioned.

See Jackson v. State, 18 So. 3d 1016, 1032 (Fla. 2009) (holding that the trial court did not abuse its discretion in admitting a recorded interview in its entirety in which a law enforcement officer related statements allegedly made by a codefendant, because the officer's statements were made solely to provoke a reaction from the defendant); see also Eugene v. State, 53 So. 3d 1104, 1111-12 (Fla. 4th DCA 2011) (holding that the trial court did not abuse its discretion in allowing the jury to hear four statements by the interrogating detectives placed in the context of the entirety of the interrogation). Such statements may be heard by the jury to "give context to the interview." McWatters v. State, 36 So. 3d 613, 638 (Fla. 2010). When placed in "their proper context," an interrogating detective's statements to a suspect could be understood by a "rational jury" to be "techniques" used by law enforcement officers to secure confessions. Id. (quoting Worden v. State, 603 So. 2d 581, 583 (Fla. 2d DCA 1992)).

Here, McMillian has failed to demonstrate deficiency. At the evidentiary hearing, trial counsel pointed to detectives' comments from the interview which were beneficial to McMillian, such as, "you're not a bad guy." Trial counsel testified that based on his experience, he did not feel that the statements at issue required redaction because some of the statements were beneficial. Moreover, the jury could hear the detectives' statements in this recording to give context to their interview with McMillian. See McWatters, 36 So. 3d at 638.

- 17 -

McMillian has also failed to demonstrate prejudice. The comments at issue included established facts, such as comments about McMillian and Danielle Stubbs breaking up and McMillian's plans to go back to Georgia, and other comments that were beneficial to McMillian. Accordingly, considering the entire recorded interview that was played to the jury, McMillian has failed to demonstrate that there is a reasonable probability that playing a redacted recording of McMillian's confession to the jury would have led to a different result. See Henry, 948 So. 2d at 617. In other words, confidence in the outcome is not undermined.

Accordingly, we affirm the trial court's denial of relief for these claims.

### B. Consolidation of Cases

Next, McMillian argues that trial counsel was ineffective for seeking consolidation of his cases for attempted second-degree murder for shooting at a police officer and Stubbs' first-degree murder. The trial court entered an order granting trial counsel's motion to consolidate on January 20, 2010. However, the postconviction trial court concluded that trial counsel's action of consolidating the cases did not fall below the standard established in Strickland.

A trial court's decision on consolidation is reviewed for an abuse of discretion. Crossley v. State, 596 So. 2d 447, 450 (Fla. 1992). Two or more offenses may be charged together if they are based on the same act or transaction, or on two or more connected acts or transactions. Fla. R. Crim. P. 3.150(a).

- 18 -

In this case, McMillian has failed to demonstrate prejudice. Specifically, the shooting at a police officer took place during McMillian's flight from police after Danielle Stubbs' murder, and this evidence would have been admissible in the guilt phase as evidence of consciousness of guilt. See Straight v. State, 397 So. 2d 903, 908 (Fla. 1981) (holding that evidence of defendant's flight and use of deadly force against officer one day after murder and other crimes was relevant to his consciousness of guilt and thus properly admitted). Accordingly, McMillian cannot establish a reasonable probability of a different outcome. See Henry, 948 So. 2d at 617. In other words, our confidence is not undermined.

### C. Failure to Object Claims

McMillian also alleges that counsel's failure to object at several points during his trial constituted ineffective assistance of counsel. However, we affirm the trial court's denial of these claims.

First, McMillian contends that trial counsel was ineffective for failing to object to the testimony of the victim's parents. "As a general rule, members of a victim's family should not identify a victim at trial where nonrelated, credible witnesses are available to make such identification." Rodriguez v. State, 919 So. 2d 1252, 1272 (Fla. 2005). However, if the family member's testimony is essential for a purpose other than just identification, it may properly be introduced at trial. Id.; see also Justus v. State, 438 So. 2d 358, 366 (Fla. 1983). Moreover, "[c]ounsel

- 19 -

cannot be deemed ineffective for failing to make a meritless objection." Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Hitchcock v. State, 991 So. 2d 337, 361 (Fla. 2008)).

In this case, the testimony of the victim's mother, Mrs. Stubbs, provided details about her daughter's move, her daughter's relationship with McMillian, the conversation she had with McMillian prior to the murder, and importantly, she provided details of the events that transpired the day the victim's body was found. And while parts of the testimony of the victim's father, Mr. Stubbs, was cumulative of the mother's testimony, Mr. Stubbs did provide additional testimony describing the condition of the crime scene when he arrived. Mr. and Mrs. Stubbs also testified about State's exhibit # 54, describing that Danielle Stubbs' brother punched a hole in the wall when he discovered the victim's body. Accordingly, there was no error in Danielle Stubbs' parents testifying at trial. See Rodriguez, 919 So. 2d at 1272 (finding no error in deceased victim's sister-in-law testifying at trial and identifying victim because she also identified property on the victim's person at the time of the shooting and provided a recounting of the victim's statements to her immediately after he was shot); see also Peede v. State, 955 So. 2d 480, 501-02 (Fla. 2007) (finding admission of deceased victim's daughter's identification testimony harmless where she testified to matters in addition to identification).

Accordingly, Danielle Stubbs' parents' testimony was properly admitted, and trial counsel was not ineffective for failing to raise a meritless objection. See Schoenwetter, 46 So. 3d at 546.

Next, we find no merit to McMillian's ineffectiveness claim for failure to object to Detective Wolcott's testimony regarding cell phone information. Under section 90.702, Florida Statutes (2010), expert testimony is defined as "scientific, technical, or other specialized knowledge." Additionally, "[t]he basic principles of cellular technology have been widely accepted and admitted into evidence." Gosciminski v. State, 132 So. 3d 678, 697 (Fla. 2013). Moreover, this Court has held that non-experts may testify about phone records. See Gordon v. State, 863 So. 2d 1215, 1219 (Fla. 2003) (stating that testimony about cell phone records and comparing them to locations on cell site maps was not expert testimony and was properly admitted); Perez v. State, 980 So. 2d 1126, 1131-32 (Fla. 3d DCA 2008) (ruling that cell phone records, cell site maps, and testimony explaining them was properly admitted and did not constitute expert testimony).

Here, Wolcott testified about the contents of the cell phone records and spoke generally about cell records. Wolcott's testimony was about basic principles of cellular technology and did not require "scientific, technical, or other specialized knowledge." See § 90.702, Fla. Stat. Accordingly, Wolcott's testimony was

properly admitted, and trial counsel was not ineffective for failing to raise a meritless objection.  See Schoenwetter, 46 So. 3d at 546.

Additionally, McMillian argues that trial counsel was ineffective for failing to object to portions of the State's closing arguments, including a description of the victim's death and comments about McMillian being unfaithful.  However, having reviewed the challenged prosecutorial comments in context, we find that the failure to object did not "so affect the fairness and reliability of the proceeding that confidence in the outcome is undermined." Jackson v. State, 147 So. 3d 469, 487 (Fla. 2014) (quoting Davis v. State, 928 So. 2d 1089, 1122 (Fla. 2005)).

Lastly, McMillian asserts that trial counsel was ineffective for failing to object to the State's use of a "dummy indictment" in which both the first-degree murder and attempted second-degree murder charges were addressed.  Because the first-degree murder charge, contained in an indictment, and attempted second-degree murder charge, contained in a separate information, were consolidated, the State prepared a document, the "dummy indictment," specifically for purposes of reading to the jury, which included language from the original indictment and information on one document.  The record demonstrates that the indictment and the information were each properly filed.  See Fla. R. Crim. P. 3.140.  And the purpose of combining the documents was to allow the trial court to read both charges to the jury.  The trial court had jurisdiction over both charges.  See, e.g., Johnson v. State,

969 So. 2d 938, 952-54 (Fla. 2007).  Therefore, trial counsel was not ineffective

for failing to raise a meritless objection.  See Schoenwetter, 46 So. 3d at 546.

Therefore, we affirm the trial court's denial of relief regarding these claims.

### IV.  HURST

Next, we consider whether McMillian is entitled to relief after the United

States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016).

Because the jury recommended the death penalty by a vote of ten to two, we

conclude that McMillian's death sentence violates Hurst.  See Kopsho v. State, 209

So. 3d 568, 570 (Fla. 2017).  We must then consider whether the Hurst error was

harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386
> U.S. 18 (1967),] and progeny, places the burden on the state, as the
> beneficiary of the error, to prove beyond a reasonable doubt that the
> error complained of did not contribute to the verdict or, alternatively
> stated, that there is no reasonable possibility that the error contributed
> to the conviction.

Hurst, 202 So. 3d at 68 (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla.

1986)).

Because the jury in this case recommended death by a vote of ten to two,

"we cannot determine that the jury unanimously found that the aggravators

outweighed the mitigation."  Kopsho, 209 So. 3d at 570.  We can only determine

that the jury did not unanimously recommend a sentence of death."  Id.  Therefore,

because we cannot say that there is no possibility that the error did not contribute

to the sentence, the error in McMillian's sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentence and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

## V. CONCLUSION

For the reasons stated above, this Court affirms the denial of the guilt phase claims raised in the postconviction motion filed pursuant to rule 3.851, but we remand for a new penalty phase pursuant to Hurst.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to Hurst.

CANADY, J., concurs.

An Appeal from the Circuit Court in and for Duval County,
    David Michael Gooding, Judge - Case No. 162009CF002002AXXXMA

Ann E. Finnell of Finnell, McGuinness, Nezami, & Andux, P.A., Jacksonville, Florida; and Billy H. Nolas, Chief, Capital Habeas Unit, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Jennifer L. Keegan, Assistant Attorney General, Tallahassee, Florida,

for Appellee